MEMORANDUM OF DECISION
On July 12, 2000, the Department of Children and Families (DCF) filed a petition seeking the termination of the parental rights of Keyoka C. and William T. J. Sr. to William T. J. Jr., hereinafter "Timmy," born on October 1995. DCF also filed a petition to terminate the parental rights of Keyoka C. and Noel S. to Brittany S., born on March 1994. The trial on the matter was held on May 14, 15, 2001 and on July 19, 20, 2001. On the first scheduled day of the trial, May 14, 2001, Noel S. executed a consent to the termination of his parental rights. DCF proceeded with the petition against Keyoka and William T. J. Sr.
On July 19, 2001, DCF moved for permission to withdraw the petition against the mother as to both of her children. Simultaneously, Noel S. moved for permission to withdraw his consent. The court granted both of these oral motions. DCF proceeded with the petition against William T. CT Page 14471 J. Sr. and against Noel S.
A written memorandum of law was submitted by counsel for the minor child on the last day of trial, July 20, 2001. The court allowed all other counsel an opportunity to file a written memorandum, provided that the filing was complete by August 3, 2001. Counsel for William T. J. Sr. submitted a memorandum on August 3, 2001. Also on this date, DCF filed a written motion to withdraw the petition against Noel S., which the court granted. DCF proceeded against William on the grounds of failure to rehabilitate and no ongoing parent-child relationship. General Statutes § 17a-112(j)(3) (B1) and (D) respectively.
The court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. The court further finds that no action is pending in any other court affecting the custody of Timmy. Evidence offered at trial, interpreted in the light of the prior court record concerning this child, of which judicial notice is taken, supports the finding of the following facts.
 I FACTS A. Procedural Background of the Case
Timmy was born on October 1995 and became the subject of a neglect petition on March 12, 1999. On this date, DCF applied for and obtained an ex-parte Order of Temporary Custody (OTC) regarding Timmy. Pursuant to General Statutes § 46b-129(b), at the time of the issuance of the ex-parte OTC, the court provided William with specific steps necessary for him to take to facilitate the reunification process.[2] William was instructed to (1) keep all appointments with DCF; (2) sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before this court; (3) secure adequate housing and legal income; (4) no substance abuse; (5) no further involvement with the criminal justice system, (6) cooperate with the Office of Adult Probation or parole officer and comply with conditions of probation or parole; (7) visit the child as often as DCF permits and demonstrate appropriate parent/child interaction during the visits.
The ex-parte OTC was sustained by the court (Foley, J.) on March 30, 1999, following a fill evidentiary hearing. The court issued a written decision articulating its findings and reasons for sustaining the OTC.[3]
The court found that, "The father of the child, William [J]. a/k/a Timmy, is presently incarcerated and not available to parent his child. CT Page 14472 His anticipated release date is August, 1999."
On May 19, 1999, William appeared in court and entered a plea of nolo contendere to the allegation of uncared for; the court (Ward, J.) then adjudicated Timmy a neglected and uncared for child. William was still incarcerated and the mother failed to appear in court on that date. The court entered an order of commitment to DCF for twelve months, and ordered mother to comply with specific steps. The court file reflects that, at that time, no action was taken by the court regarding final specific steps for William. DCF placed Timmy in the foster home of Brittany's paternal grandmother.
On April 17, 2000, the court (Goldstein, J.) extended Timmy's commitment, effective May 19, 2000, for an additional twelve months. The court also approved a permanency plan of termination of parental rights. The court file, of which the court. has taken judicial notice, indicates that William was present in court and objected to a permanency plan seeking a termination of parental rights. He was incarcerated at the time. On April 4, 2001, the court (Tanzer, J.) once again extended Timmy's commitment, effective May 19, 2001, for an additional twelve months.
 B. The Mother
At the time of his birth, Timmy's mother Keyoka, was just barely eighteen years old, and his father, William was two months shy of his seventeenth birthday. Brittany, Keyoka's first born child, was born on March 1994, when Keyoka was sixteen and a half years old. Brittany's father Noel S., was also sixteen and a half years old. Keyoka lived in her mother's home until she learned that she was pregnant with her second child. "Once I got pregnant with Tim I decided I had to be on my own. I have two kids now. I moved out on my own."[4] Life as a single mother of two young children proved to be very difficult for Keyoka.
 C. The Father
William was born on December 1, 1978 in South Carolina. He is currently twenty-three years old. He attended New Britain High School until the tenth grade when he dropped out.[5] Psychological testing showed William to function in the low average range of intelligence.[6] The social study, the psychological evaluations, as well as the report of a Parole Board Mental Health Consultation discuss William's involvement with the juvenile justice system, including a stay at Long Lane.
 1. Criminal History
CT Page 14473
By the time that Timmy was born in October 1995, William, at the time only sixteen and a half years old, was already serving a three year period of probation. According to his criminal record,[7] William was arrested on December 10, 1994, nine days after his sixteenth birthday, and charged with criminal trover in the first degree.[8] He was held in custody until June 7, 1995, when he was convicted and sentenced to a three year jail sentence, suspended due to the time he had already served from the time of his arrest, and placed on three years of probation. The probation, beginning on June 7, 1995, if successfully completed, would end on June 7, 1998.
On June 23, 1995, just two weeks after being released from jail and placed on probation, William was arrested for assault in the second degree. Three weeks after that arrest, on July 12, 1995, William was arrested again and charged with possession of marijuana and weapons in a motor vehicle, a felony. Three weeks after the birth of his son, on October 25, 1995, the court disposed of all charges then pending against William. The court convicted William on the charge of weapons in a motor vehicle.
He was sentenced to one year in jail, execution suspended, and an eighteen month period of probation. This, of course, meant that William would be released into the community rather than being confined in prison. He would have an opportunity to be on hand for his newborn son and hopefully address the issues in his life that contributed to his involvement with the criminal justice system. Notwithstanding the fact that the juvenile justice system failed William by not adequately addressing the areas of concern in his life prior to his sixteenth birthday, the adult criminal justice system was giving both itself and William another opportunity to work at correcting a negative life style.
A mere six days after being placed on probation, however, on October 31, 1995, when Timmy was twenty-eight days old, William was arrested again; this time for committing an act of domestic violence on Keyoka. He was released pending the resolution of this case. However, a short time later, on February 26, 1996, records show that he was in custody in the Hartford Community Correctional Center for three days until he was released on bond. Records further show that he was held once again at the Hartford Community Correctional Center beginning on May 13, 1996 until June 11, 1996.[9]
Ten days after being released, on June 21, 1996, when Timmy was almost nine months old, William was once again arrested. He was charged with a number of offenses including sale of narcotics and violation of probation. He was held in custody from the time of his arrest in June until September 10, 1996, when he posted bond. His record shows that he CT Page 14474 failed to appear in court on October 8, 1996 and he was rearrested on October 31, 1996. He remained in custody until he was convicted and sentenced.
On December 10, 1996, when Timmy was only fourteen months old, William was convicted and sentenced on the sale of narcotics charge, as well as on the pending domestic violence and violation of probation charges. This time the court imposed a six year jail sentence, execution suspended after serving thirty months. Upon his anticipated release in 1998, he was to serve a three year period of probation.
According to the Department of Correction information sheet entitled "Transfer among DOC Locations,"[10] on March 6, 1998, William was released into the community on supervised parole. Three days later, on March 9, he was arrested, charged once again with sale of narcotics and returned to jail. He remained in custody until he was convicted of that charge on May 4, 1998 and sentenced to a fifteen month jail term; his anticipated release date was August 3, 1999. His son, at the time only two and a half years old, would have to wait another fifteen months for his father. Regrettably, Timmy needed a father on March 9, 1999. This was the day that DCF removed Timmy from the home of his mother and placed him in foster care, where he has remained.
On August 3, 1999, William was released from jail. His criminal record shows that twenty days later William was arrested and charged with motor vehicle violations. On October 12, 1999, William was arrested again and charged with a sale of narcotics. He was held in custody until July 5, 2000, when he was convicted for violation of probation and sentenced to serve twenty-four months in jail. His son, now three months shy of celebrating an important milestone in his life, his fifth birthday, would have to continue to wait for the adults in his life, including his father, to meaningfully address their issues and provide a home for him.
William was serving this sentence at the time of this trial. He testified that he expected to be released on October 13, 2001.
 2. Department of Correction; Inmate Disciplinary Record.
William's difficulty in leading a life following rules of conduct and behavior outside of prison extended to his life within the prison walls as well. William's record of offenses while in the custody of the Commissioner of Correction was introduced at trial as a full exhibit.[11]
It is abundantly clear that William was persistent in offending while he was incarcerated. Beginning in 1995, William was charged as follows:
i. 1995: three separate incidents, in April, May and June ranging fromCT Page 14475insulting language, threatening and disobeying direct orders.
ii. 1996: three separate incidents in May, August and November rangingfrom flagrant disobedience, insulting language and threatening fellowinmates as well as officers.
iii. 1997: five separate incidents in March, April, July, August andNovember ranging from disorderly conduct, fighting, and disobeying directorders.
iv. 1998: six separate incidents in May, June, three occurred in July,August, ranging from possession of contraband (cigarettes, batteries,altered disposable razor), causing a disruption, and being out of place.
v. 1999: nine separate incidents, two of which occurred in January, onein June, one in October, four in November ranging from disobeying directorders, insulting language, and causing a disruption.
vi. 2000: one incident in June for insulting language.
vii. 2001: one incident in March for flagrant disobedience and oneincident in April for causing a disruption.
The sanctions imposed for committing these offenses while incarcerated included a loss of privileges, such as telephone, mail, and recreation, as well as isolation from the general population.
 3. Psychological Profile.
The court heard the testimony of William. He stated that ". . . [from the first month that my son was born, I started receiving SSI.[12] I don't know if you have a record of that, but they granted me — I was getting $470.00 a month. Also, I had got back pays, which was well over $60,000.00, which you can check into that."[13] William explained that he has been told that he suffers from a disability, but that he does not "feel like I have one." He was unable to explain whether or not he was told if it was a physical or a mental disability. In an effort to address and clarify the possible existence of a disability, the parties agreed that a copy of a "Parole Board Mental Health Consultation" report could be introduced as a full exhibit.[14]
That report, dated April 17, 1997, discusses William's past psychiatric history. It references William's in-patient and out-patient treatment at facilities such as the Klingberg Center, the Wheeler Clinic and Highland Heights. The report also mentions William's past diagnosis of Attention Deficit Disorder, which was treated briefly with Ritalin and discontinued CT Page 14476 due to the negative side effects. There is no mention of any disability in this report nor does any other evidence introduced at trial support a finding of a disability.
The court heard the testimony of Kelly F. Rogers, Ph.D. a licensed psychologist and the court appointed evaluator. On January 2 and 10, 2001, he a performed psychological evaluation of William as well as an evaluation of the relationship between William and Timmy. On November 8 and 14, 2000, Dr. Rogers performed an evaluation of Timmy.[15] The reports of his evaluations of William and Timmy were introduced as full exhibits.[16] According to Dr. Rogers, William:
 [A]ppears to be an individual with a limited regard for the rights and feelings of others. Prone to impulsive and irresponsible action, he can be expected to consistently put his interests ahead of others, even his children. Possessed of apparently poor judgement and little tolerance for frustration, it is likely that he will frequently come into conflict with others. In fact, many of his actions may be tailored to perpetuating his problems in adjusting. He does not appear amenable to change. Antisocial Personality Disorder with Narcissistic and Self-Defeating Features was indicated. While he may sometimes respond to stress with anxiety, there was little suggestion of a clinically significant psychiatric illness.[17]
Dr. Rogers, during his testimony, discussed William's behavior during the evaluation process. He described William as possessing an "uncommon anger," even issuing threats to the evaluator, which Dr. Rogers described as "highly inappropriate" According to Dr. Rogers, William became "increasingly vehement and crossed to my side of the desk, demanding that I surrender all his materials so that he might `tear them up' I told him that I was not at liberty to do so . . . during our short walk, [William] emphasized, `I ain't committed no crime yet, as long as you don't lie on the stand.' [Dr. Rogers] took this as a threat, but it seemed imprudent to further question [William] on his intentions at that point."[18]
The court finds it highly significant that William would behave in such an aggressive manner, while not only in the presence of a court appointed evaluator, but in a prison with guards. While the court may understand William's feelings regarding the system, "[t]he system ain't fair. I'm incarcerated for something I didn't do. They judged me for my past,"[19]
the court cannot understand his incapacity to exercise any level of self-control in such a situation. It is common and, perhaps only human, to try and impress an evaluator who will be reporting to a court on one's CT Page 14477 suitability to parent, or have contact, with a small child. One would expect, however, the attempt would be to make the impression positive and helpful rather than negative and injurious.
Dr. Rogers' evaluation of William does not disclose a disability and as, previously stated, he did not find evidence of a clinically significant psychiatric illness.
 4. Relationship with Timmy.
Dr. Rogers also evaluated an interaction between Timmy and his father. This evaluation provided him with an opportunity to discuss the relationship that may exist between father and son.
 "There was little suggestion of anything more than a passing familiarity between father and child. [William]'s attempts to relate to [Timmy] were awkward and the boy seemed uncomfortable with his father's insistence that he recognize a relation between them. There is no suggestion of a parent/child relation between the boy and his biological father . . .
 Placement of William with his biological father at anytime in the foreseeable future is strongly contraindicated. While there may be some tenuous acquaintance between father and son, there is little to suggest that [Timmy] would benefit from further visitation, or that he would suffer from its absence. It is not anticipated that any form of counseling would materially alter these circumstances . . .
 While there is a remote possibility that [William]'s characterological difficulties might improve with psychotherapy, he shows little motivation for meaningful change, and such efforts would likely be fruitless. . . .
 [William] is strongly prone to engage in dangerous activity and shows a limited ability to sustain meaningful and positive relations with others. This is not expected to change. Encouraging the relation between father and son would be expected to, at best, disappoint the boy and, given the father's apparent willingness to coerce an attachment, could substantially confuse and distress the child."[20]
CT Page 14478 Notwithstanding Dr. Roger's opinion of William, and despite his consistent periods of incarceration, William attempted to maintain contact with his son and with DCF. The court was presented with numerous copies of letters and cards sent by William to his son.[21] In addition, DCF stipulated that many other cards and letters were sent but copies were not available at the time of trial. William also provided the court with four sales receipts confirming the purchase of the cards by William while incarcerated.[22] Two receipts are for cards purchased in November 2000 and two, receipts are for cards purchased in December 2000. Undoubtably, given the significant amount of cards sent by William, many receipts are also missing.
The court was also presented with a multitude of copies of letters sent by William to DCF.[23] The letters essentially request information regarding his son. One letter dated July 22, 1997, two years before the ex-parte OTC. asks DCF to consider placing Timmy with William's sister Latrina. Other letters expressed the frustration he experienced confronting what he considered as barriers to free and open telephone conversations with his son. William provided the court with a copy of a calender in which he made notations regarding contacts with his son.[24]
Although respondent's counsel stated that the calender was kept over time, the court believes that the calender was made in preparation for trial rather than contemporaneous with each event. The notations indicate that in 1999, William called his son twice in March, the month that Timmy was first placed in foster care, three times in April, four times in May. twice in June, and three times in July.
His pattern of calls changed in August 1999. He was released from jail on August 3, 1999 and according to his notations, he called his son on that date. The following day, he appeared at the home of the foster mother for a visit with his son. The day following the visit he was told by DCF that visits with his son would be scheduled at the DCF office and not at the foster home. DCF scheduled a visit at its office for the following week, however, William's own notations indicate that he missed that first visit that had been scheduled for August 13, 1999. He then began a pattern of calling the foster home twice a day every day, until DCF instructed him to call only once a day. The notations made in September indicate weekly attempts to call his son as well as DCF to arrange for visits. As mentioned previously, William was arrested again in October 1999, and his calender reflects that no contact of any kind was had between father and son from October 1999 through May 2000. There is evidence that calls were made to the foster home and cards were mailed to Timmy after that date.
 D. Timmy. CT Page 14479
Timmy is a six year-old little boy that has spent a significant amount of the early developmental years of his life outside of the care of his biological parents. He was first removed from his mother on March 9, 1999, pursuant to a ninety-six hour hold, and immediately placed in foster care where he has remained. As stated previously DCF's permanency plan for Timmy included the termination of the parental rights of both of his parents. Due to the mother's successful efforts at rehabilitation, DCF, honoring their mission of promoting children's best interest, modified their plan to one of reunification with the mother.
On March 11, 1999, shortly after his removal from his biological mother's home, William was taken by DCF to a hospital for a Child Abuse Consult.[25] According to the examining physician, the examination revealed a "1 centimeter irregular scar on the lower lid of the left eye. This scar is consistent with the disclosure of inflicted trauma to the eye. Other causes of the scar cannot be excluded by this examination, however, trauma would be the most common cause of this type of scar) According to the social study,[26] Timmy ". . . is a very active and independent little boy. He was evaluated by Birth to Three and found to have mild delays in language and fine motor skills."
Since his removal, Timmy has been living with his sister in the home of his sister's paternal grandmother, Mrs. C. By all accounts, Timmy is very bonded to his sister and she is considered to be one of the most important connections in his life. Although Timmy had members on the paternal side of his family who contacted DCF to be placement resources for him, due to licensing requirements, they were unable to so act. In addition, there was a general consensus that to separate Timmy from his sister was not in his best interest. It is noteworthy that even William encouraged the bond by consistently adding a sentence in his letters to Timmy, to "look out for your sister." A careful reading of William's letters to his son reveals an urgent directive to take care of his sister.
As stated previously, Dr. Rogers conducted a psychological evaluation of Timmy.[27] He found Timmy to be in the "Low Average range — below his apparent intellectual functioning. This supported observations that the child has developmental delays in visuomotor functioning." In addition, Dr. Rogers opined that Timmy's "problems forming letters and numbers are likely sufficient to merit notation of a graphomotor learning disorder." Fortunately for Timmy, Dr. Rogers found "no suggestion of attachment problems, thought disorder, disruptive behavior or attentional difficulties."[28]
What Dr. Rogers did find was that while Mrs. C., her husband and the biological mother were important figures in Timmy's life, "[he] CT Page 14480 registered little more than a vague familiarity with [William]. He certainly gave no indication in word or action that this was a parent figure, much less a psychological father. At times, he seemed mildly frightened in the man's presence, and he never sought attention, nurturance or affection from him. There was no indication of a meaningful bond between biological father and son."[29]
 II ADJUDICATION A. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable and unwilling to benefit from reunification efforts." General Statutes § 17a-112(j)(1). In its petition, DCF alleges that reasonable efforts are not required for William as the court determined at a hearing pursuant to General Statute § 17a-111(b), and/or § 46b-129(k)(2) that such efforts are not appropriate. DCF also alleges that William is unable or unwilling to benefit from reunification efforts.
The court file in this case reflects that on April 17, 2000, the court (Goldstein, J.) found that further efforts to reunify Timmy with his father were no longer appropriate. The file further reflects that on April 4, 2001, the court (Tanzer, J.) once again found that any further efforts to reunify were no longer appropriate. Notwithstanding these findings, unless this court finds that William is unable or unwilling to benefit from reunification efforts, DCF must establish by clear and convincing evidence that reasonable reunification efforts were made from March 9, 1999, the day of the removal, through April 17, 2000, the date that the court decided that reasonable efforts were no longer appropriate.
As noted previously, at the time of Timmy's removal on March 9, 1999, William was incarcerated and serving a fifteen month sentence for sale of narcotics. As a result, he was unavailable to participate in any community programs designed to address rehabilitation issues. On August 3, 1999, he was released from prison. A mere two months later, however, William was back in jail for sale of narcotics. During the two months that he was not in jail, William was provided with visitation, first at the home of the foster parent and then at the DCF office. According to his own calender, he made one visit to the foster home the day after he was released, and missed the next visit, which was scheduled at the DCF CT Page 14481 office on August 13, 1999. He had no other visits with his son prior to his return to jail on October 12, 1999. William testified that he recently had several visits with his son at the jail where he is currently incarcerated.
Many of William's letters to DCF consist of requests for visits during his various periods of incarceration. The evidence indicates that DCF had concerns over Timmy's reluctance to visit. William told DCF that he had asked Timmy if he wanted to visit with him and Timmy said that he did. Mrs. C., the foster mother testified that many times Timmy was upset after talking with either of his parents and she was concerned for his well being. Despite this concern, William recently has had several visits with his son at the jail where he is currently incarcerated. The DCF social worker currently assigned to the case, transported Timmy to these visits.
In addition to the visits, William was provided the opportunity to make phone calls to the foster home to talk to Timmy. As a result of the sanctions imposed for the offenses he committed while incarcerated, there were many times that William did not have access to a telephone in jail. When he was first released from jail in August, he made calls to the foster home twice a day until DCF asked him to call once a day. Even after the April 17, 2000 court finding that reasonable efforts were no longer appropriate. DCF continued case management services to William.
Notwithstanding that this court finds that DCF has shown by clear and convincing evidence that it made reasonable efforts to reunify William with his son as far as was practicable under the circumstances of this case, the court further finds that William is unable and unwilling to benefit from any further reunification services. Evidence of this is found in William's prolonged involvement with the criminal justice system. Even when he was released from jail and allowed to finish his sentence on parole, he was unable to refrain from criminal activity. Not only does he refuse to abide by the criminal laws of the State of Connecticut, but he adamantly and flagrantly refuses to follow the rules of the correctional facilities in which he has been confined. His contempt for authority goes so far as to threaten a court appointed psychologist during a mandated evaluation.
What is most tragic and perhaps more telling regarding William's inability to benefit from further reunification services is his lack of insight into the events that have sadly shaped his life. William testified that while incarcerated he has taken several programs, such as anger management, parenting and substance abuse prevention. When asked by his attorney, "Once you get out, do you feel that you would be able to parent your child?" William answered, "Yes, I do." Although the court CT Page 14482 believes that change is always possible when one is determined to engage in the arduous task of confronting and accepting the choices made in one's life, there are times when the journey to the destination of confrontation and acceptance takes too long. Within the framework of the child protection laws of Connecticut, this court believes that William's journey will take too long before he is ready to ever benefit from reunification efforts.
 B. Adjudication 1. Failure to Rehabilitate.
The court finds, by clear and convincing evidence, that William is the parent of a child that has been previously adjudicated a neglected child and that he has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Timmy's age and needs, he could assume a responsible position in his life. General Statutes § 17a-112(j)(3) (B1).
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence that the level of rehabilitation [he] has achieved, if any falls short of that which would reasonably encourage the belief that at some future date [he] can assume a responsible position in [his] child's life." (Citations omitted; internal quotation marks omitted.) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873
(1999). The inquiry for the trial court was whether the respondent achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes (Rev. To 1997) § 17a-112. This inquiry required the court to obtain a historical perspective of the respondent's child caring and parenting abilities. In re Galen F.,54 Conn. App. 590, 594, 737 A.2d 499 (1999).
The court finds that William has never played a useful or constructive role in Timmy's life. Despite his many convictions and periods of incarceration, William has had several opportunities to play a useful role in Timmy's life. Given his release from incarceration on June 7, 1995, four months before Timmy's birth, he could have started to engage in activities that would have better prepared him for his new role as a teenage father, rather than continuing his involvement with the criminal CT Page 14483 justice system. He had a probation officer from whom he could have sought direction and guidance if he had no other resources. Instead, he continued his lifestyle of criminal behavior right through Timmy's birth and first year of life. The outcome, of course, was further separation from his son.
William testified that sometime in November or December 1995, he received a lump sum payment of $60,000.00 for what he called `back pay' for SSI payments. There was no documentation of any kind to substantiate such a payment. He said that he saved none of this money, but rather, spent it on ". . . clothes, a bed, things like that when he [Timmy] was younger, and I got it right before Christmas in 1995. A lot of it went on Christmas, not only on him though, but on Brittany as well."[30]
When asked by the child's attorney for the reason that he would continue to sell drugs despite having $60,000.00, he responded: "Why did I continue to sell drugs? I guess it was the immaturity, I guess."[31]
William had another opportunity to play a useful role in Timmy's life on March 6, 1998, when he was released from jail and into the community to finish his sentence on parole, instead of in confinement. But again, instead of taking advantage of his freedom to be a resource for Timmy, he was arrested just three days later on, March 9 for sale of narcotics. He was returned to jail. As stated in section I C 2 of this decision, it was also in 1998, when William was charged with six separate offenses while incarcerated.
Despite his uncorroborated statements of participation in anger management classes and other life enriching classes while in jail, William continued to offend while imprisoned. He has been unable to apply himself to any meaningful rehabilitation efforts. "At the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court was whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than he had been at the time of the children's commitment." In reHector L., 53 Conn. App. 359, 367, ___ A.2d ___ (1999), citing In reMichael M., 29 Conn. App. 112, 126, 614 A.2d 832 (1992). The court finds that William has not achieved any degree of rehabilitation.
Next the court looks at whether or not the parent could achieve a level of rehabilitation within a reasonable time, considering the age and needs of the child, to encourage the belief that the parent could play a meaningful role in the life of the child. This prong of the statute requires the court to determine if additional time should be given to the parent to attempt to rehabilitate. In making this determination, the court must look at the age and particular needs of the child. Here, Timmy is CT Page 14484 six years old. He has never lived with his father. His contacts with his father have been limited to a few restrictive visits. As Dr. Rogers stated, "the boy seemed uncomfortable with his father's insistence that he recognize a relation between them."
As Timmy prepares for his first years in school, he is also preparing to reunify with his mother, after a long period of separation. There is evidence that William engaged in acts of domestic violence against Timmy's mother a few short weeks after Timmy's birth. In fact, he was convicted and served a period of incarceration for these violent acts. It is clear that a little six year-old boy who has endured a separation from his mother, with whom he is very bonded and connected, needs stability as well as safety. As Dr. Rogers stated, "At times, [Timmy] seemed mildly frightened in the man's presence [William's], and he never sought attention, nurturance or affection from him." "In a case of this type, the court may reasonably rely on the opinion of an expert witness." In reEden, 250 Conn. 674, 707, ___ A.2d ___ (1999) "The psychological testimony from professionals is rightly accorded great weight in termination proceedings . . . `Furthermore, it is well established that a trial court [is] free to judge the credibility of the expert witnesses.'" (Citation omitted; internal quotation marks omitted.) In reSavanna M., 55 Conn. App. 807, 816; 740 A.2d 484, (1999).
The court finds, by clear and convincing evidence, that William could not achieve any level of rehabilitation, within a reasonable time, that would allow him to play a meaningful role in the life of his six year-old little boy. Timmy needs consistency and safety, along with his basic needs of shelter and clothing. He, as well as the family unit he will hopefully soon be returning to, need support and serenity, rather than disappointments and exposure to uncontrolled expressions of anger. The court further finds that if William were to engage in a serious effort to rehabilitate, the time necessary to achieve such a goal would be far too long and far from reasonable.
 2. No Ongoing Parent-Child Relationship.
The court finds, by clear and convincing evidence, that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. General Statutes § 17a-112(j)(3)(D).
 "This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be CT Page 14485 a determination that no parent-child relationship exists and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted; internal quotation marks omitted.) In re Jonathon G., 63 Conn. App. 516, 525, ___ A.2d ___ (2001).
As stated in part I C 4 of this decision, the court heard the expert testimony of the court appointed evaluator, Dr. Rogers, as well as read the report of his evaluation of the parent-child relationship. The testimony and the report alone, clearly support a finding that no parent-child relationship exists between Timmy and his father. However, the court was presented with additional evidence. The court heard the testimony of Mrs. C., the foster mother, who described Timmy's negative behavior after conversations with his father. In addition, the court heard the testimony of the social workers, as well as read the social study, regarding Timmy's reluctance to visit with his father. The court finds, by clear and convincing evidence, that no ongoing parent-child relationship exists within the meaning of the statute.
The second prong of the statute requires the court to determine if it is in the child's best interest to allow time for such a relationship to develop. "To satisfy the second prong [of the analysis], the trial court was required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship . . . The `best interest standard' therefore does not become relevant until it has been determined that no ongoing parent-child relationship exists. . . . The factors to be considered in deciding whether it would be in Savanna's best interest to permit further time for a relationship with her father to develop, include (1) the length of stay with her foster parents, (2) the nature of her relationship with her foster parents. (3) the degree of contact maintained with the natural parent and (4) the nature of her relationship to her natural parent." Inre Savannah, 55 Conn. App. 807, 816; 740 A.2d 484 (1999).
The court finds, by clear and convincing evidence, that it is not in Timmy's best interest to allow any additional time to develop such a relationship. As stated previously, Timmy is about to begin a new phase CT Page 14486 in his life. This phase will include addressing the issues that have surrounded his young life to date. His father has not been able or willing to make Timmy a priority in his life. He has disappointed Timmy in the past, and without meaningful intervention efforts to change a negative lifestyle, it is likely that he will disappoint Timmy in the future. As stated previously, Timmy has been separated from his father for far too long. The court does not believe it is in Timmy's best interest to continue to be exposed to the risk of disappointment and loss by his father again.
 III REQUIRED FINDINGS
The court makes the following factual findings as required by General Statutes § 17a-112(k):
1. Due to William's chronic incarceration during Timmy's life, DCF was unable to provide community based reunification services. DCF did provide limited visitation coordination and case management services as far as practicable given the circumstances of this case.
2. As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify William and Timmy, as far as practicable given the circumstances of this case. The court, however, further finds that William is unable and unwilling to benefit from reunification services.
3. The court finds that reasonable court expectations were provided to William. One of the most reasonable and basic expectations was to discontinue any further involvement with the criminal justice system. He has been unable to do so. No demonstrable change in his behavior has taken place.
4. The court finds that Timmy has no positive connection with his father. He is immensely connected to his sister. He also has strong positive feelings for Mrs. C., his foster mother, as well as her husband. He is also bonded with his biological mother. His physical and emotional needs have been met on a consistent basis by his foster family.
5. Timmy was born on October 1995. He just turned six years old.
6. As discussed in detail above, the court finds that William has not made any changes in his life to accommodate for the care and nurturing of Timmy. CT Page 14487
7. No unreasonable conduct is noted in the conduct of the child welfare agency or on the part of any person so as to prevent William from maintaining a meaningful relationship with Timmy. Incarceration alone does not preclude the forming of positive parental connections.
 IV DISPOSITION
"A hearing on a petition to terminate parental rights involves two phases: adjudication and disposition . . . During the adjudicatory phase, the trial court determines whether one or more of the statutory grounds for termination of parental rights exists by clear and convincing evidence . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase where the court then determines whether the termination of parental rights is in the best interest of the child." (Internal quotation marks omitted; citations omitted) In re Maximina V., 44 Conn. App. 80, 82-83, ___ A.2d ___ (1997).
"At the dispositional hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." In reRomance M., 229 Conn. 345, 356-357; ___ A.2d ___ (1994). "Conducting a best interest analysis is not a narrow concept restricted to a compelling reason or to fully reuniting the parent with the child. Rather it is purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Internal quotation marks omitted; citations omitted) In re Alissa N., 56 Conn. App. 203, 208, ___ A.2d ___ (1999). The court finds, by clear and convincing evidence, that it is in Timmy's best interest to terminate his father's parental rights to him. The court further finds that it is contrary to Timmy's best interest to continue to be exposed to William's inconsistent and negative lifestyle.
Timmy has never lived with his father. Although he recognizes William as his biological father, he does not share a parental bond with him. "In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." In re Savannah M.,55 Conn. App. 807, 816, 740 A.2d 484, citing In re Nicolina T.,9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804,525 A.2d 519 (1987). The court has considered this factor.
Notwithstanding this biological bond, the court finds that Timmy has been living in a state of `limbo' for far too long. It appears as if, finally, lie will be able to look forward to living in a permanent home with his mother. In Ireland v. Ireland, 246 Conn. 413, 430, ___ A.2d ___ CT Page 14488 (1998), a case involving a custodial parent's attempt to relocate out of state with the children of her marriage to the non-custodial parent, the court held that, ". . . we believe that an attempt to determine what is best for the child without consideration of what is best for the family unit, with whom the child spends the most significant amount of his or her time, would be an incomplete inquiry."
Timmy, like all children, needs his home to be a violence-free environment. Although given the realities of our world today, it is impossible to guarantee such a home to any child, one can attempt to reduce the risk of consistent exposure to sudden and violent outbursts of anger and violence. Despite William's statements that he has taken steps to control himself and his anger, tragically his behavior and his record do not support his words. "The best interests of the child include the child's interests in sustained growth, development, well-being and continuity and stability of its environment." (Citations omitted; internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159,167, 752 A.2d 1139 (2000), quoting Schult v. Schult, 241 Conn. 767, 777,699 A.2d 134 (1997).
The court concludes, based on clear and convincing evidence, that termination of William's parental rights is in Timmy's best interest. Accordingly, a termination of the parental rights of William T. J. Sr. is ordered. Pursuant to General Statutes § 17a-112(n), the mother, Keyoka C., remains as the sole parent of Timmy, while DCF remains as his legal guardian pursuant to the order of commitment originally entered by the court on May 19, 1999 and due to expire in April 2002. The Commissioner of the Department of Children and Families shall file a report with the court, within thirty days. Said report shall comply with State and Federal law as well as provide an update on the reunification efforts made by DCF with the mother.
So ordered.
Carmen L. Lopez, Judge Child Protection Session